IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SAMIRA KAADY, Personal Representative               CV. 06-1269-PK
of the ESTATE OF FOUAD KAADY,
SAMIRA KAADY, RACHID KAADY,
VANIA KAADY, ANDREA KAADY

                                                    AMENDED
                                                    OPINION AND ORDER

                    Plaintiffs,

v.

CITY OF SANDY, a municipal corporation
of the State of Oregon, CLACKAMAS
COUNTY, by and through the Clackamas
County Sheriff's Office, a political
subdivision of the State of Oregon,
WILLIAM BERGIN, DAVID WILLARD,
JOHN DOES 1-10, in their individual and
official capacities
                    Defendants.

_____

PAPAK, Magistrate Judge:

        This is an action for money damages under 42 U.S.C. § 1983 and Oregon law against the

two law enforcement officers who shot and killed Fouad Kaady and against the City of Sandy

Page 1 - AMENDED OPINION AND ORDER

and Clackamas County who employed those officers.  Plaintiff Samira Kaady is the personal representative for Fouad Kaady's estate.  She and plaintiff Rachid Kaady are Fouad's parents. Plaintiffs Vania and Andrea Kaady are Fouad's siblings.

Defendants' motions for summary judgment and motions to strike are now before the court, as are the motions to strike plaintiffs assert in their response to summary judgment.  This court has jurisdiction pursuant to  28 U.S.C. §§ 1331, 1343 and 1367.  Plaintiffs confirmed at oral argument that they abandoned their Third, Fifth, Sixth and Eighth Claims for Relief.  The plaintiffs' motions to strike and the defendants' motions to strike are denied.  For the reasons discussed below, the defendants' motions for summary judgment are granted in part and denied in part.

## BACKGROUND

On September 8, 2005, Fouad Kaady was driving on Bluff Road in Clackamas County when he ran into the car in front of him, damaging the car's rear bumper and trunk.  She called 911 to report the accident.  Dispatch entered a summary of her call that indicated that she was "hysterical," that she was rear-ended, and that it was a possible hit-and-run.  Officers could see the summary of the call on the on-board computers in their patrol vehicles.  The driver sustained whiplash and scratches on her legs and an ambulance later arrived to take her to the hospital for treatment.

The accident damaged the hood of Kaady's car so that it obscured the windshield.  Kaady continued down the road a short distance and hit a pickup truck from the rear, but merely dented the truck's rear bumper.  The pickup truck driver also called 911.

Kaady, with the hood of his car still obscuring the windshield, then hit another pickup

truck from the rear, again only causing damage to the rear bumper.  Kaady's car then went off the road and into the woods.  The driver of the second pickup truck called 911, reported that he might be injured and that the car that hit him was on fire.  Dispatch summarized that call by describing the accident as an injury hit-and run and indicating that the suspect car had stopped and was catching on fire.

The car fire attracted the attention of individuals in the area.  Ronald Poirier stopped at the scene and learned that the man from the burning car had gone into the woods.  Poirier went into the woods to check on him.  He indicated that Kaady acted like he wanted to fight him and kicked him in the chest and then walked away.  Poirier later told investigators that he could see that Kaady's hands were empty.  After Kaady was out of Poirier's line of vision, Poirier heard a loud pop that sounded like a gun shot coming from the woods and relayed that information to emergency personnel.  Another bystander, Tamara Sedgewick, called 911.

**I.      Law Enforcement Response to the Scene of the Car Fire**

William Bergin, a police officer for the City of Sandy, heard over his radio that there had been a hit-and-run traffic incident.  He testified that the broadcast indicated the suspect had intentionally run someone off the road.  The dispatch broadcast, however, merely indicated that the accident was a hit and run.  Although the accidents occurred outside the Sandy city limits, Bergin volunteered to respond because he was closer than other responding officers.

Bergin gathered additional information on his way to the accident scene by reading the display on the on-board computer in his car.  He learned that there had been a second accident. He also learned that the car that caused the accident had smoke and flames coming from it. Dispatch broadcast a summary of a 911 call, which conveyed that the suspect was naked, in the

woods, combative, high on drugs and possibly armed.  The summary on officers' on-board computers further indicated that Kaady assaulted a person who went in the woods after him. Officers could hear the dispatch summary over their radios or read the summary on the on-board computers in their vehicles.  They could not, however, hear the substance of 911 calls.

Bergin was the first law enforcement officer at the scene.  He saw the first car, an ambulance, and that emergency personnel had someone on a stretcher.  He passed two grass fires along the road as he drove toward the suspect's car.  Once there, he encountered people standing near the edge of the road, looking into the woods.  Bergin testified that a man at the scene, presumably Poirier, told Bergin that the suspect kicked him in the chest when he tried to help. Willard later radioed that a man indicated that Kaady hit the man in the face when he tried to help.

The evidence conflicts regarding what witnesses told Bergin about possible gun shots. Bergin testified that a woman told him that Kaady got out of the car and fired one shot.  Bergin also testified that the woman did not relay that she saw the suspect shoot the gun, but just that there was a "shot fired."  Sedgewick, the bystander who called 911, indicates that she never told officers at the scene that the suspect had a gun, and instead indicated that she heard a popping noise but she did not know if it was a gun or sounds from the fire.

Bergin relayed on the radio that a witness reported shots fired.  Dispatch entered a summary that indicated "one gun shot was heard by a citizen in the wooded area."  Bergin did not question the bystanders further, and instead told them to move back and stand behind a truck parked up the road.  He drew his sidearm, took cover behind a vehicle and waited for other officers to arrive.

Page 4 - AMENDED OPINION AND ORDER

Clackamas County Sheriff Deputy Willard arrived at the scene after Bergin. Willard indicates that a man and a woman at the scene told him "multiple shots had been fired." According to defendants' summary of the radio communication during the actual incident, however, Willard relayed that bystanders reported hearing several gunshots but the sounds could actually be explosions from the car fire. Willard testified that he questioned whether the sounds reported as gunshots were actually the car tires exploding due to the fire. Bergin testified that either Willard or another deputy told him the reports of shots fired could be due to popping noises from the fire.

Willard and another deputy went a few yards into the woods with shotguns to protect firefighters as they put out the car fire. The other deputy found bloody clothes in the woods and Willard donned his gloves and briefly checked for identification. Willard radioed that they found clothes covered in blood and that the suspect appeared to be moving southward.

Willard and Bergin heard over the radio that a citizen reported a naked, bloody man walking down SE 362nd Avenue. The computerized summary of the dispatch that appeared on officer's on-board computers indicated "citizen report that there is a naked man walking down 362nd all cut up."[1] The radio broadcast and the on-board computer summary did not indicate that the man had a gun.

Willard and Bergin decided to go to SE 362nd Avenue. They went in Bergin's car

---

[1] Another bystander, Elaine Thornlimb, called 911 to report that she saw a naked man walking on 362nd Avenue. She also indicated that she did not see any weapons. As officers approached, she reported that Kaady "was not right in the mind" and she was afraid he would attack the officers. Willard and Bergin could not hear 911 calls and the dispatch summary did not relay that Kaady was unarmed and "not right in the mind." As a result, the officers approached Kaady without the benefit of this information.

because other emergency vehicles had blocked Willard's car.  Willard had his shotgun with him

in the car because the gun rack in Bergin's car already had a weapon in it.

Bergin and Willard passed an elementary school on their way to SE 362nd Avenue, knew

school was in session, but did not see anything out of the ordinary there.  They encountered

Kaady approximately 200 yards from the school.  The school, however, was on another road,

past an intersection that was over 150 yards from Kaady.

## II.    Initial Law Enforcement Contact With Kaady

Willard and Bergin testified that, when they arrived at the scene, Kaady was sitting in the

northbound lane of 362nd Avenue next to the edge of a driveway, with his hands in his lap

looking down.  Willard also indicated that, before they got out of the car, he and Bergin both

verbally confirmed that they did not see any weapons.  Willard stated that Kaady did not appear

agitated and Bergin testified that Kaady did not change his position as they approached. Willard

and Bergin could see that Kaady had burns over his torso and arms, was bloody and appeared to

be seriously injured.  The autopsy report indicates that Kaady had extensive "thermal injuries"

on his front torso, upper extremities and face.

Both officers pointed their weapons at Kaady and ordered him to show his hands.  Bergin

pointed his sidearm at Kaady from behind the car door.  Willard initially pointed his shotgun at

Kaady but drew his Taser when he saw Kaady's physical condition and that Kaady had no visible

weapon.  Both officers shouted at Kaady to show his hands, and Kaady immediately complied.

Willard then told Bergin to let him do the talking.

Willard and Bergin stepped away from the police car, which was still running, and

approached Kaady.  Willard left his shotgun on the hood of the car.  He told investigators and

later testified that he disabled ("deadlined") his shotgun.  He also told investigators, however, that he did not unload the shotgun before leaving it on the car and replied "no" when asked if he applied "security locks or anything."

Willard radioed for medical assistance.  Willard testified that he needed to detain Kaady quickly so he could get medical attention.  Medical personnel would not come near enough to treat Kaady unless law enforcement indicated that the area was secure.

Willard and Bergin, however, also testified that they thought Kaady could run away or charge at them, because of the report that he assaulted a person trying to help him and because he left the scene of the accident naked.  Bergin also testified that he thought it was strange that Kaady continued to drive a burning car following the first collision.  In addition, Willard testified that, although Kaady was naked and displaying his hands and it was a "slim possibility" that Kaady was armed, he "did not 100 percent know that he did not have a weapon."  Bergin testified that, although he did not see a weapon, he did not know if Kaady was sitting on one.

### A.     Officers' Account of Their Interactions With Kaady

Willard testified that he informed Kaady that he needed medical help, he asked Kaady to lie on his stomach on the pavement, and Kaady refused.  He then considered that the pavement might be hot and asked Kaady to lie down on a patch of grass, which was four to twenty feet away.  Kaady said yes but remained seated.  Willard testified that Kaady was "communicating very well" during this exchange.  Bergin indicated that Kaady chuckled, said "okay," just a minute" and "no" but kept his hands where they could seem them.

Willard later told investigators that he did not know what he would do if Kaady complied and lied down on the grass.  He thought he would wait for other officers to arrive.  He did not

want to touch Kaady because Kaady was covered in blood, although he later told investigators he had gloves on during the incident.

Bergin indicated that Willard warned Kaady more than once to get on the ground or he would be shot with a Taser.  Willard testified that he did not try any other way to get Kaady to cooperate other than telling him to lie down on his stomach on the grass or pavement, despite the visible burns on Kaady's torso.  Bergin holstered his firearm and drew his Taser as he circled behind Kaady.  Both officers testified that they switched from their firearms to Tasers in the mistaken belief that the other officer still had his firearm trained on Kaady.

### B.    Witness Accounts of Officers' Interactions With Kaady

Several witness accounts vary with the officers' description of their interactions with Kaady.  Three witnesses testified that they did not hear officers say anything before they saw Kaady react to the Taser, although these witnesses remained near their homes, more than 80 yards from the scene.  Another witness, however, indicated that the officers gave Kaady orders before they used their Tasers on him.  Three witnesses also testified that they saw the officers use their Tasers almost immediately after they arrived.

### III.    Use of the Taser

When Kaady did not lie down on the grass, Bergin used his Taser to shoot probes into Kaady's back and deploy a five-second electrical charge.  The testimony conflicts regarding how far Bergin was from Kaady when he used his Taser on him.  Bergin said he was between  five feet away and 20 feet away from Kaady, but Willard estimated that Bergin was four or five feet away.  Although backup officers were on their way and Bergin did not know how close they were, he testified that he used the Taser at "an ideal time" because he could target a large muscle

Page 8 - AMENDED OPINION AND ORDER

group on Kaady's back while Kaady was stationary.

The Taser caused Kaady to fall on his back and shake from the electrical charge. Bergin testified that Willard ordered Kaady to roll over on his stomach. A witness stated that she heard officers shouting at Kaady to stop.

Kaady did not roll over onto his stomach. Bergin indicated that, although at this point Kaady was on his back and they could see Kaady was not hiding a weapon under his legs, he was not in an "ideal position" for them to take control of him. He further testified that he was trained "not to bring the level of force down until you get compliance."

Bergin deployed his Taser a second time. Both officers testified that Kaady began to get up during the first charge, either by sitting up, getting up on his side, or attempting to stand. Willard testified that Kaady bared his teeth and issued a low-level growl after the first charge. Bergin, however, also told investigators and testified that Kaady was on his back when he deployed the Taser for another five-second charge.

Willard used his Taser against Kaady shortly after or during Bergin's second charge. The officers testified that during the second charge, Kaady fell back and then got on his feet and tried to stand. Bergin indicated Kaady responded to the second charge by laughing and growling. Willard told investigators that it appeared only one of the two barbs from his Taser was a "good hit."

Willard and Bergin offered several explanations for their decision to use their Tasers on Kaady. They testified that they did not use lower levels of force because they thought Kaady was impervious to pain. Willard also stated he used the Taser to detain Kaady so he could get medical help. Willard's declaration also indicates that the blood on Kaady made him slick and

Page 9 - AMENDED OPINION AND ORDER

therefore difficult to grab.  Willard was also concerned that Kaady's blood could get on them if

they tried to grab him.  Bergin testified that he though it was appropriate in some circumstances

to use a Taser to gain compliance and that a person who said no to a police command showed a

level of resistance beyond passive resistance.  Willard also testified that he thought it was within

the Clackamas County Sheriff's Office policy to use a Taser to get a person to comply with

orders.

### IV.    Use of Deadly Force

####    A.    Officers' Account of Kaady's Behavior

After Willard and Bergin both deployed their Tasers against Kaady, he ran from the two

officers toward the driveway nearby.  As he ran, he shoved at the Taser wires in his back.

Willard told investigators that Kaady turned around as soon as the Taser wires broke. Bergin

testified that Kaady ran toward Willard, and repeatedly yelled "I'm going to kill you."

Willard turned and ran from Kaady because he felt Kaady was gaining too quickly.

Bergin, in the meantime, was trying to change his Taser cartridge because he thought something

might be wrong with it.  Before he could load a new cartridge, he saw Kaady run toward the

front of the patrol car.  Bergin thought Kaady might try to get the shotgun that Willard left on the

hood of the car and decided to switch from the Taser to his sidearm.  He could not get his Taser

holstered, so he tossed it, in Kaady's direction, onto the hood of the car.

Kaady jumped onto the hood of the police car, left the shotgun there, and then got onto

the roof of the car as Willard ran toward the back of the car.  Bergin and Willard testified that

Kaady made growling sounds and repeatedly said, "I'm going to kill you." Willard testified that

he was near the rear quarter of the police car, on the driver's side, when he turned around and

Page 10 - AMENDED OPINION AND ORDER

first saw Kaady on the roof of the car.  He tossed aside his Taser, which he was trying to reload while running, and drew his sidearm.

The officers offered several explanations for their decision to use lethal force.  Willard testified that Kaady posed a threat because he was covered in blood, he traveled nearly one mile from the scene of the collision, seemed indifferent to pain and had behaved unpredictably.  Willard also indicated that he couldn't let Kaady leave, that he needed to stop Kaady, but that he was afraid to touch him because of possible hepatitis or AIDS exposure from his blood.  Although Bergin was near Willard at the side or near the back of the car, he testified that he thought Kaady would attack Willard, get his gun, and use it against Willard, himself, or the other people in the area.  Both officers indicated that naked, injured suspects could pose a lethal threat because they could be on drugs that render them impervious to pain or could take an officer's gun away in a struggle.

The officers fired their sidearms at Kaady while Kaady was still on the roof of the car.  Willard testified that Kaady was "on the balls of his feet" and his movement "was in a forward motion" towards him.  Willard fired twice at Kaady and then paused.  Bergin testified that he saw, from the side, that Kaady hunched forward and looked as if he was going to jump off the car toward Willard.  He fired five rounds at Kaady without pause.

### B.    Witnesses' Account of Kaady's Behavior

All the witnesses indicated that Kaady ran back and forth in the street after the officers shocked him with their Tasers.  One witness said Kaady ran towards one officer and then turned and ran toward the other before running to the top of the patrol car as if he was cornered.  Another said Kaady made a "prancing" movement back and forth and did not charge either

Page 11 - AMENDED OPINION AND ORDER

officer. Others indicated that Kaady ran back and forth and that Kaady did not charge the officers. Yet another witness said it looked as if Kaady charged at him and that he was afraid of Kaady.

Several witness also indicated that they did not hear Kaady yell "I'm going to kill you." One witness states that Kaady did not say anything, while another indicates that he did not hear Kaady say anything to the officers. Yet another declaration states that Kaady never threatened the officers. Another witness said that Kaady merely growled at Willard and Bergin.

The witness accounts also differ with the defendants' account and with each other regarding Kaady's actions immediately before Willard and Bergin fired. One witness later told a police investigator that Kaady lunged at the officers. Another witness, however, indicated that he does not remember seeing Kaady "leaning or leaping or crouching as if to leap." Yet another witness said it looked as if Kaady was going to jump away from the officers.

### C.    Position of the Officers When They Shot at Kaady

The testimony and evidence conflict regarding the position of the officers when they fired at Kaady. Bergin testified at his deposition and indicated in his statement to investigators that he was on the driver's side of the car toward the rear of the car and Willard was off to his right, also at the rear of the car, on the passenger's side. He also testified that he was not sure where Willard was. Ron Fazio, plaintiffs' forensic expert, reviewed the location of the spent casings and determined that Bergin was on the driver's side, approximately 3.5 to 10 feet from the car when he shot at Kaady.

Willard told investigators that, when he stopped shooting, he was near the rear quarter panel of the car and Bergin was a few feet from him at the rear of the car. Willard testified that

he thought he did not have a lot of distance to back away from the car and Kaady because there was a ditch behind him. Fazio's declaration, however, indicates that Willard began shooting directly north of the police car and that no physical constraints prevented Willard from getting farther away from the car. Willard told investigators that, if he retreated, Kaady would have access to the car and the shotgun.

Fazio also offered evidence regarding Kaady's position as the officers fired. His declaration indicates that Kaady received seven gunshot wounds. The declaration further indicates that only two wounds could possibly have occurred while Kaady was directly facing the shooter. He determined that an exit wound at Kaady's armpit, could be determined to come directly from the front, as the shooter faced Kaady and Kaady was bent at the waist. A wound to Kaady's left foot could have occurred either if Kaady was facing the shooter with his leg in the air or lying down, facing away from the shooter, with his leg in the air. Another wound, an exit wound on the left side of Kaady's chest, suggests that Kaady was upright and at a right angle to the shooter and that his arms were raised. Fazio could not conclusively attribute these wounds to either officer.

Fazio attributes two of the gunshot wounds to Bergin, who fired five rounds. Fazio's declaration indicates that one of these wounds, which was to Kaady's right buttock, was only possible if Kaady was approximately upright and facing directly away from Bergin. The other wound, to Kaady's torso, suggests that Kaady was upright and at a right angle to Bergin and that his arms were raised.

Only one wound could be directly attributed to Willard, who fired three rounds. The wound was to Kaady's left buttock and was consistent with Kaady bent backwards, facing

Page 13 - AMENDED OPINION AND ORDER

directly away from Willard.  Willard testified that Kaady was falling backward as he fired his third and final shot.

Both officers fired at Kaady nearly simultaneously, although Willard's declaration indicates that he believes he fired the first shot.  Kaady fell from the car, with his head facing the rear of the car and his feet facing the front.  Willard radioed for medical assistance.

Kaady was five feet, nine inches and weighed 150 pounds when Bergin and Willard shot him.  A toxicology screen revealed that Kaady was not under the influence of drugs.  The defendants' summary of the radio traffic of the incident indicates that two minutes had elapsed from the time the officers reported that they had encountered Kaady to the time that they reported shots fired.

## V.    Clackamas County and City of Sandy Investigation of the Shooting

Following the shooting, the Clackamas County Sheriff's Office assigned a team to conduct a criminal investigation.  The team included representatives of the district attorney's office and the medical examiner.  An investigator interviewed Bergin the day after the shooting. No one interviewed Willard, however, until four days after the incident, which was the soonest that Willard's attorney informed investigators that he was ready to provide a statement. Investigators also interviewed witnesses.  Several witnesses indicated in subsequent declarations that they thought investigators asked leading questions that favored the officers and that investigators had misstated their answers to questions.

The district attorney received the results of the investigation and reviewed them for possible criminal charges.  The district attorney presented charges to a grand jury.  The  grand jury returned a not true bill.

Page 14 - AMENDED OPINION AND ORDER

After the grand jury results, the Clackamas County Sheriff's Office convened a Shooting Review Board to review the Kaady incident. The Board was comprised of Clackamas County Sheriff's Office deputies and supervisors. The Board met seven times and reviewed training curricula, the 911 tapes and dispatch summaries of 911 calls that appeared on the officers' on-board computers, and heard testimony from other members of the Clackamas County Sheriff's Office regarding crisis intervention and other procedures.

The Board concluded that Willard complied with Clackamas County Sheriff's Office policy and training. As a result, Craig Roberts, the Clackamas County Sheriff, decided not to take any disciplinary action against Willard. Roberts confirmed in his declaration that he is the final policymaker for the Sheriff's Office.

In November 2005, following the release of the Clackamas County Shooting Review Board report and the grand jury investigation, Sandy Police Chief Skelton and his two sergeants conducted a review of the existing reports of the incident. Skelton indicated that he limited his review to the existing reports because he did not have the resources or the experience to call witnesses, although his officers accompanied sheriff deputies to some of the interviews during the Clackamas County investigation. Skelton also testified that he decided to have supervisory personnel review the reports because the department was a "tight-knit group" and the shooting had affected everyone. Skelton himself reviewed Bergin's and Willard's reports of the shooting, along with the Shooting Review Board's report. Skelton concluded, based on that information, that Officer Bergin's use of force and deadly force was legally justified and reasonable under the circumstances.

**LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 516 U.S. 1171 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## I.    Motions to Strike

A plaintiff seeking to avoid summary judgment cannot rely solely on conclusory allegations unsupported by factual data. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). A declaration filed in support or opposition to a motion for summary judgment must be made by witnesses having personal knowledge of the facts stated therein, state facts that would be admissible evidence, and affirmatively show that the witness would be competent to testify at trial. Fed. R. Civ. P. 56(e). The evidence cannot be merely speculative. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *Head v. Glacier Northwest, Inc.*, 413 F.3d 1053, 1059 (9th Cir. 2004). Rather, the evidence must be based on personal knowledge and contain sufficient detail. *Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir. 2001). Thus, at the summary judgment stage, a court "may simply disregard those facts that are irrelevant, without adequate foundation, or concerning ultimate questions." *See, .e.g., Shulgan v.*

Page 16 - AMENDED OPINION AND ORDER

*Noetzel*, No. 07-051, 2008 WL 1730091, at *5 (E.D. Wash. 2008); *Maytag Corp. v. Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1062 (N.D. Iowa 2006).

A.    **Motions to Strike Factual Claims**

Here, the parties have numerous disputes over the proper characterization of the facts in the record and the admissibility of the evidence.  The court, however, has reviewed the record in its entirety and thus does not rely on the parties' efforts to characterize particular evidence.  I have also disregarded irrelevant or unsupported material.  I therefore deny the motions to strike asserted in Plaintiffs' Response to Joint Concise Statement of Fact and defendants' Motions to Strike Factual Claims in Plaintiffs Memorandum and Concise Statement.

B.    **Motions to Strike the Declaration of Plaintiff's Expert**

Defendants filed a separate motion to strike the declaration of plaintiffs' expert, Michael Lyman.  I did not find the declaration critical to the determination of any issue on summary judgment.  In reaching this conclusion, however, I make no finding regarding the admissibility of Lyman's opinion or testimony at trial.  Rather, I decline to indulge the defendants' effort to obtain a ruling on admissibility and I deny defendants' Joint Motion to Strike Michael Lyman Declaration.

C.    **Motions to Strike the Declarations of Plaintiffs' Fact Witnesses**

 "Factual assertions in pleadings and pretrial orders, *unless amended*, are considered judicial admissions conclusively binding on the party who made them."  *Parker v. Community First Bank*, 123 F.3d 1243, 1248 (9th Cir. 1997) (citing *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988)). "Where, however, the party making an ostensible judicial admission explains the error in a subsequent pleading or by amendment, the trial court

must accord the explanation due weight." *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859-60 (9th Cir. 1995). Thus, a party may retract a factual allegation in the complaint in its opposition to a motion for summary judgment. *See id.* Moreover, a court may treat a complaint as an affidavit for purposes of summary judgement only if that complaint is verified, sets forth specific facts admissible as evidence, and is based on personal knowledge. *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995).

Defendants filed a motion to strike portions of plaintiffs' fact witness declarations on grounds that they were inconsistent with allegations in the complaint, that they contradicted the witnesses' statements in the audio recordings of their 911 calls, and that they were vague, conclusory, inflammatory and irrelevant. I find that plaintiffs' opposition to summary judgment has effectively retracted the conflicting factual allegations in her complaint. In addition, the content of the 911 calls is not critical to my analysis of the issues on summary judgment because the officers could not hear those calls but rather received only a summary of their contents. Finally, I have disregarded portions of the witness statements that were vague, conclusory or otherwise irrelevant to summary judgment. I therefore deny defendants' Joint Motion to Strike Fact Witness Declarations.

**II.    Standing**

**A.    Standing to Bring Wrongful Death Claim Under Oregon Law**

In Oregon, courts regard an action for wrongful death as "exclusively statutory in nature." *Union Bank of Cal. v. Copeland Lumber Yards, Inc.*, 213 Or. App. 308, 313, 160 P.3d 1032 (2007). Under Oregon's wrongful death statute, when an unlawful act leads to the death of a person, only the personal representative of the estate can bring an action for wrongful death.

Or. Rev. Stat. § 30.020; *Dasteur v. American Economy Ins. Co.*, 127 Or. App. 686, 690, 874 P.2d 85 (1994). The personal representative acts only as a nominal party. *Mendez v. State*, 64 Or. App. 581, 587, 669 P.2d 364 (1983).

Here, Samira Kaady has standing to sue for wrongful death because she serves as the personal representative of Fouad Kaady's estate. Samira Kaady is the only proper plaintiff for the state wrongful death claims, and only in her capacity as the personal representative of Fouad's estate. Rachid, Vania and Andrea Kaady do not have standing to sue under Oregon's wrongful death statute. Accordingly, to the extent that Rachid, Vania and Andrea Kaady seek recovery under state law claims for wrongful death, I grant defendants' motion for summary judgment on those claims.

### B.  Substantive Due Process Claims Under 42 U.S.C. § 1983

"[A] parent has a constitutionally protected liberty interest in the companionship and society of his or her child." *Ward v. San Jose*, 967 F.2d 280, 283 (9th Cir. 1992) (internal citation omitted). Thus, the Ninth Circuit recognizes that parents can maintain a 42 U.S.C. § 1983 substantive due process claim for unlawful deprivation of the right to their adult son's companionship. *See, e.g. Porter v. Osborn*, No. 07-35974, slip op., 2008 U.S. App. LEXIS 21878, at *2, 13-14 (9th Cir. Oct. 20, 2008). The Ninth Circuit, however, has held that siblings may not bring that claim because they do not possess a substantive due process liberty interest in the companionship of a brother or sister. *Ward*, 967 F.2d at 284. Moreover, "[t]he Supreme Court has made it clear . . . that only official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter*, 2008 U.S. App. LEXIS at *14 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

Page 19 - AMENDED OPINION AND ORDER

Here, the defendants correctly contend that the complaint does not assert a cause of action for deprivation of substantive due process.  Although Plaintiffs referred to an amended complaint at oral argument on this issue, they have not filed an amended complaint.   The current complaint alleges Fourth Amendment violations and state law claims for wrongful death.  The damages section of the complaint alleges that "as a direct and proximate result of Defendants' deprivations of *Fouad Kaady's federal civil rights*, Plaintiffs Samira Kaady, Rachid Kaady, Vania Kaady, and Andrea Kaady suffered the loss of their son and brother." (emphasis added). This allegation, however, does not assert that the plaintiffs suffered an independent deprivation of their constitutional right to Fouad's companionship.  Thus, no substantive due process claim is before the court at this time.

### C.    Survival of Fourth Amendment Claims Under 42 U.S.C. § 1983

"Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969).  "Thus, the general rule is that only the person whose Fourth Amendment rights were violated can sue to vindicate those rights." *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998) (internal citation omitted).  When the Fourth Amendment violation results in death, however, 42 U.S.C. § 1983 does not explicitly cover survival of the cause of action.  *See Robertson v. Wegmann*, 436 U.S. 584, 589 (1978).

Where federal law does not provide specific guidance,  42 U.S.C. § 1988 directs "federal courts to follow a three-step process to borrow an appropriate rule." *Burnett v. Grattan*, 468 U.S. 42, 47 (1984).  First, courts look to the laws of the United States "so far as such laws are suitable to carry [the civil and criminal civil rights statutes] into effect." *Id.* at 47-48 (quoting 42

Page 20 - AMENDED OPINION AND ORDER

U.S.C. § 1988).  Second, if federal law is "deficient in the provisions necessary to furnish

suitable remedies," courts apply state "common law, as modified and changed by the constitution

and statutes" of the forum state.  42 U.S.C. § 1988.  Third, the federal court must reject the

application of state law if it is "inconsistent with the Constitution and laws of the United States."

*Id.*; *Robertson*, 436 U.S. at 590.

### 1.    Sufficiency of Federal Law

Defendants argue that 42 U.S.C. § 1983 is not deficient with regard to the rules

governing survival of claims following the plaintiff's death.  They contend that Congress

deliberately chose to exclude § 1983 claims from the survival provision set forth in 42 U.S.C. §

1986.  As a result, defendants claim that courts should not borrow state survival statutes under 42

U.S.C. § 1988 because Congress has already spoken on the issue.

Defendants' argument is foreclosed, if not by *Robertson* itself, where the parties agreed

that courts should apply § 1988 to determine survival, 436 U.S. at 388, then certainly by Ninth

Circuit precedent.  *See, e.g.*, *Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1094 n.2

(9th Cir. 2006) (looking to California survival statute in § 1983 case); *Moreland*, 159 F.3d at 370

(looking to Nevada survival statute); *Guyton v. Phillips*, 606 F.2d 248, 251 (9th Cir. 1979); *see

also Brazier v. Cherry*, 293 F.2d 401, 407 (5th Cir. 1961) ("[T]here is a vast body of law

furnishing additional evidence that Congress considered it proper to look to the states in

supplying the necessary survival mechanisms to make the civil rights policies effectual.").  I

therefore turn to Oregon's survival statute to determine which plaintiffs have standing to sue for

the Fourth Amendment violations alleged in the complaint.

### 2.    Survival and Wrongful Death Actions Under Oregon Law

Oregon law provides for the survival of a cause of action for injuries suffered by an individual who dies before judgment is rendered. *See* Or. Rev. Stat. § 30.075(1). When an injury results in death, however, "recovery of damages for disability, pain, suffering and loss of income during the period between injury to the decedent and the resulting death of the decedent may only be recovered in the wrongful death action." Or. Rev. Stat. § 30.075(3). Oregon's wrongful death statute not only provides for the damages the decedent incurred between the injury and death, it also provides for damages suffered by the decedent's estate as well as the decedent's parents own pecuniary loss and their loss of the decedent's society, companionship and services. Or. Rev. Stat. § 30.020(2). In both a survival cause of action and a wrongful death claim, the only proper plaintiff is the personal representative of the estate. Or. Rev. Stat. §§ 30.075(1), 30.020(1).

In summary, under Oregon's survival statute, only Samira Kaady, as the personal representative of Fouad's estate, has standing and she may only recover for Kaady's injuries that did not result in death. Or. Rev. Stat. § 30.075. Under Oregon's wrongful death statute, Samira Kaady remains the only individual with standing, but she may recover on behalf of the estate for the damages that resulted from Fouad's death. Or. Rev. Stat. § 30.020.[2]

---

[2] As noted, Section 30.075(3) provides that a plaintiff in a survival action may not recover attorney fees "for damages arising out of injuries that result in death." Or. Rev. Stat. § 30.075(3). That section further provides "recovery of damages for disability, pain, suffering and loss of income during the period between injury to the decedent and the resulting death of the decedent may only be recovered in the wrongful death action." *Id.*

Defendants contend that the Oregon legislature added § 30.075(3) to eliminate survival actions when a plaintiff has already brought a wrongful death claim. Under Oregon law, however, a plaintiff may bring both a survival and a wrongful death claim but cannot receive a double recovery. *Roe v. Pierce*, 102 Or. App. 152, 157, 794 P.2d 4 (1990), vacated on jurisdictional grounds 313 Or. 228 (1992). Although defendants further assert that the Oregon legislature passed § 30.075(3) to overrule *Roe v. Pierce*, the legislative history indicates that

### 3.        Oregon's Survival Statute Is Inconsistent With the Purpose of § 1983

The remaining inquiries, under § 1988, are whether the limitation in Oregon's survival statute are inconsistent with federal law and, if so, what rule applies.  "The policies underlying § 1983 include compensation of persons injured by deprivation of federal rights and prevention of abuses of power by those acting under color of state law." *Robertson*, 436 U.S. at 590-591. Thus, "Congress intended significant recompense when a constitutional violation caused the death of a victim." *Berry v. City of Muskogee*, 900 F.2d 1489, 1501 (10th Cir. 1990); *see also Brazier*, 293 F.2d at 404 ("Violent injury that would kill was not less prohibited than violence which would cripple.").  Moreover, if § 1983 "did not allow recovery for loss of life notwithstanding inhospitable state law, deterrence would be . . . subverted since it would be more advantageous to the unlawful actor to kill rather than injure" the victim. *Bell v. City of Milwaukee*, 746 F.2d 1205, 1239 (7th Cir. 1984) overruled on other grounds by *Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005).

Here, Oregon's survival statute substantially limits the type and amount of damages that are recoverable in § 1983 claims where the constitutional violation causes the death of the victim.  I therefore conclude that Oregon's survival statute is inconsistent with the compensation and deterrence policies that Congress intended  § 1983 to serve.

### 4.        Application of Oregon's Wrongful Death Statute

Although it appears that neither the Supreme Court nor the Ninth Circuit has addressed the issue, several federal circuit courts have examined whether the forum state's wrongful death

---

legislature added that section "to foreclose attempts to use the fee shifting provisions of the survivor statute in the context of wrongful death." *Sonsteng v. Dominican Sisters of Ont., Inc.*, No. 06-476, 2007 U.S. Dist. LEXIS 75601, *4-5 (D. Or. Oct. 9, 2007).

Page 23 - AMENDED OPINION AND ORDER

statute confers standing on a § 1983 plaintiff to sue for injuries that resulted in death.  The

circuits are split in their reasoning on this issue, but not the result.  They differ only with regard

to whether courts should find standing pursuant to the forum state's wrongful death statute or as a

matter of federal common law.

Several circuits look to the forum state's wrongful death statute to confer standing.  For

example, in *Andrews v. Neer*, the Eighth Circuit held that the state wrongful death statute

conferred standing on the plaintiff to bring an action for the constitutional violation that resulted

in her father's death.  253 F.3d 1052, 1058 (8th Cir. 2001).  The plaintiff could not, however, use

the state wrongful death statute as a vehicle to recover for her own injuries under § 1983.  *Id.* at

1063.  The Fifth Circuit, in *Brazier v. Cherry*, on the other hand, drew no distinction for § 1983

and § 1988 purposes between the applicability of Georgia's survival statute and its wrongful

death statute.  293 F.2d at 409.  The Fifth Circuit continues to follow this holding.  *Ryhne v.*

*Henderson County*, 973 F.2d 386, 391 (5th Cir. 1992) (Texas wrongful death statute conferred

standing on mother seeking to recover for her own injuries resulting from the deprivation of her

son's constitutional rights); *see also Carringer v. Rodgers*, 331 F.3d 844, 850 (11th Cir. 2003)

(applying *Brazier*).

Other courts have rejected the forum state's wrongful death statute as a means to confer

standing on a § 1983 plaintiff.  In *Jaco v. Bloechle*, for example, the Sixth Circuit held that

Ohio's survival statute was hostile to the purposes of § 1983 because it did not allow for the

survival of claims when death was instantaneous.  739 F.2d 239, 242-45 (6th Cir. 1984).  The

court, however, also found that Ohio's wrongful death statute was irrelevant to the question of

standing to bring the decedent's legal claims because the statute did not provide for the survival

of claims but rather created a cause of action for the benefit of decedent's heirs. *Id.* at 243. As a result, the court did not look to the wrongful death statute and instead held that the plaintiff, to the extent she qualified as the decedent's personal representative under Ohio law, had standing to prosecute the § 1983 claims arising from his death. *Id.* at 245; *Berry*, 900 F.2d at 1506 (declining to look to state wrongful death statute and instead holding that a survivor action existed as a federal remedy applied in § 1983 death cases); *see also Williams v. City of Oakland*, 915 F. Supp. 1074, 1079 (N.D. Cal. 1996) (borrowing California's survival statute under 42 U.S.C. § 1988 but excluding provision that limited damages to losses the decedent incurred before death).

As the cases above demonstrate, regardless of whether the court borrows from the state wrongful death statute or rules as a matter of federal common law, the law must provide some mechanism to assert the claims of victims who die as a result of an unconstitutional act. Here, Oregon's wrongful death statute confers standing solely on the personal representative of the estate to pursue a cause of action for the damages that flowed from an injury that resulted in death. I look to that statute and conclude that Samira Kaady has standing, as the personal representative of Fouad's estate, to assert his § 1983 claims for defendants' violations of his Fourth Amendment rights.[3]

---

[3] In adopting Oregon's wrongful death statute to confer standing, I take no position on the remedies available to the plaintiffs under 42 U.S.C. § 1983. Specifically, I make no finding on whether Samira Kaady is entitled to all the remedies available under the wrongful death statute, nor do I find that she may seek more than the statute specifically allows. I note, however, that several courts have addressed whether to borrow the damages available under the state wrongful death statute. *See, e.g., Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 601 (6th Cir. 2006) (borrowing Michigan's wrongful death statute to address question of available damages and finding the statute's exclusion of hedonic damages was not inconsistent with § 1983); *Bass v. Wallenstein*, 769 F.2d 1173, 1189-90 (7th Cir. 1985) (declining to borrow Wisconsin's wrongful death

On the other hand, Fouad's father, Rachid Kaady, and his sisters, Vania and Andrea Kaady do not have standing under the Oregon wrongful death statute.[4]  Accordingly, Rachid, Vania and Andrea Kaady do not have standing under 42 U.S.C. § 1983 to assert a cause of action for damages arising out of defendants' alleged violations of Fouad's Fourth Amendment rights.  I therefore grant defendants' motions for summary judgment on Rachid, Vania and Andrea Kaady's claims for relief under 42 U.S.C. § 1983.

In summary, plaintiffs Rachid, Vania and Andrea Kaady do not have standing to assert either the state wrongful death claims or the 42 U.S.C. § 1983 claims alleged in the complaint.  Samira Kaady, however, as the personal representative of Kaady's estate, has standing to pursue those claims.  Finally, the complaint does not allege a substantive due process violation arising from the plaintiffs' loss of Fouad's society and companionship.

## III.    Individual Officer Liability Under 42 U.S.C. § 1983

Qualified immunity shields government actors from a suit for damages if a reasonable official could have believed that his or her conduct was lawful, in light of clearly established law and the information possessed by the official.  *Anderson v. Creighton*, 483 U.S. 635, 637-39, 641 (1987).  Because qualified immunity is immunity from suit, rather than "a mere defense to

---

statute's exclusion of hedonic damages because limitation was inconsistent with policies behind § 1983); *Bell*, 746 F.2d at 1236 (same); *Gilbaugh v. Balzer*, No. 99-1576, 2001 U.S. Dist. LEXIS 9864, at *20 (D. Or. June 7, 2001) (declining to borrow Oregon's wrongful death statute's restrictions on available damages because they were inconsistent with § 1983).

[4]The standing provision of Oregon's wrongful death statute does not conflict with § 1983. As a matter of federal constitutional law, a decedent's siblings cannot recover for loss of society and companionship.  *See Ward*, 967 F.2d at 284.  A parent *can* recover for loss of the decedent's society under federal law,  *see id.* at 283, and the wrongful death statute allows the personal representative of the estate to seek recovery on behalf of parents. Or. Rev. Stat. § 30.020(2).

liability", courts should rule on the issue early in the proceedings so that defendants avoid the costs and expenses of trial where the defense is dispositive. *Saucier v. Katz*, 533 U.S. 194, 200 (2001).[5]  Thus, at the summary judgment stage, a court necessarily decides qualified immunity if it turns on issues of law.  *See Torres v. City of L.A.*, 540 F.3d 1031, 1044 (9th Cir. 2008) (internal citations omitted).  A court, however, may submit qualified immunity to the jury where genuine issues of material fact exist.  *Id.*

In assessing whether an officer is entitled to qualified immunity, the court first must inquire whether the facts alleged, taken in the light most favorable to the plaintiff, establish a constitutional violation.  *Saucier*, 533 U.S. at 200.  If the court finds a constitutional violation, the court must next consider "whether the right was clearly established."  *Id.* at 202.  "Qualified immunity is an affirmative defense; if the plaintiff proves that the right allegedly violated was clearly established, the burden shifts to the defendant official to prove that his or her conduct was reasonable even though it might have violated the law."  *Neely v. Feinstein*, 50 F.3d 1502, 1509 (9th Cir. 1995) (internal citation omitted).  To determine the clearly established law at the time of the alleged conduct, the court first reviews Supreme Court and Ninth Circuit precedent. *Kirkpatrick v. City of Los Angeles*, 803 F.2d 485, 490 (9th Cir. 1986).  In the absence of binding precedent, the court may review other decisional law, in light of whether the Supreme Court or the Ninth Circuit or would adopt the analysis.  *Id.*

The unlawfulness of the official's conduct "must be apparent" in light of the law existing at the time of the conduct.  *Anderson*, 483 U.S. at 640.  Courts do not consider the constitutional

---

[5]  The Supreme Court recently granted certiorari in *Pearson v. Callahan*, 128 S. Ct. 1702, 170 L. Ed. 2d 512 (2008), directing the parties to brief the question of whether *Saucier* should be overruled.

right at issue as a "general proposition." *Saucier*, 533 U.S. at 201.  Rather, "[t]he relevant,

dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was

unlawful in the situation he confronted." *Id.* at 202.  The Supreme Court, however, has refused

to require that a plaintiff demonstrate the existence of a "fundamentally similar" or "materially

similar" case. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  There can be "notable factual

distinctions between the precedents relied on . . . so long as the prior decisions give reasonable

warning that the conduct then at issue violated constitutional rights." *Id.* at 740 (quotation

omitted); *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all

but the plainly incompetent or those who knowingly violate the law").

> A.      **Taser Use – Excessive Force Standard**

Police officers may only use force that is objectively reasonable under the circumstances,

viewing the facts from the perspective of a reasonable officer on the scene.  *Graham v. Connor*,

490 U.S. 386, 396 (1989).  Courts determine the reasonableness of police use of force at the

summary judgment stage by balancing the "nature and quality of the intrusion on the individual's

Fourth Amendment interests against the countervailing government interests at stake." *Id.* at

396.  Courts assess the nature of the intrusion based on the type and amount of force inflicted.

*See, e.g., Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994).  The next step of the analysis

requires that the court weigh the government interest by considering: 1) the severity of the crime

at issue, 2) whether the individual posed an immediate threat to the safety of the officers or

others, and 3) whether he or she actively resisted arrest.  *Graham*, 490 U.S. at 396.

Police officers may only use force that is objectively reasonable under the circumstances,

In addition to the factors mentioned above, courts may consider the reasonableness of

officers' use of force in light of whether officers knew that an individual was mentally unstable.

Page 28 - AMENDED OPINION AND ORDER

*Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001) ("The problems posed by an unarmed, emotionally distraught individual who is creating a disturbance are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal. . . . In the former instance, increasing the use of force may exacerbate the situation."). In some cases, courts may consider the availability of alternative methods of capturing or subduing a suspect. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). However, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-397.

### 1.    Type and Amount of Force Inflicted

As indicated above, a court's excessive force inquiry begins with an assessment of the type and amount of force inflicted. *Chew*, 27 F.3d at 1440. Here, the parties have not presented evidence regarding the amount of force that a Taser inflicts, other than noting the amount of electricity it delivers. However, "case law indicates that Tasers are generally considered non-lethal or less-lethal force." *Sanders v. City of Fresno*, 551 F. Supp. 2d 1149, 1168 (E.D. Cal. 2008) (citing cases). The Taser sends an electrical pulse through the body that disrupts the target's neuromuscular system and causes involuntary muscle contraction. *Id.* While the Taser does not typically cause any lasting injury or pain, being shocked by a Taser is a painful experience. *Id.* I therefore conclude that use of a Taser constitutes an intermediate level of force and a significant intrusion on a victim's Fourth Amendment rights. *Id.*; *see also Beaver v. City of Federal Way*, 507 F. Supp. 2d 1137, 1144 (W.D. Wash. 2007) (finding Taser constitutes significant force).

Page 29 - AMENDED OPINION AND ORDER

2.        **Severity of Crime at Issue**

Having found that the Taser constitutes a significant intrusion, the court must balance

that intrusion against the government interest that justified it.  *Graham*, 490 U.S. at 396.  Under

the first of the *Graham* factors, the court considers the severity of the crimes at issue.  Here,

Bergin and Willard had information to suggest that Kaady had been involved in three vehicular

accidents, one of which possibly resulted in injury, that his car had caught fire at some point, and

that his car ran off the road and he left the scene.  The officers also had information to suggest

that Kaady was an accident victim himself.  Officer Bergin saw two brush fires along the road

before he encountered Kaady's car and that he considered Kaady to be resistant to pain in part

because he suspected that Kaady drove the car while it was on fire.  At the same time, the

officers had learned that the suspect had kicked a man who tried to help him following the crash

and was possibly under the influence of drugs.  Finally, the officers heard a dispatch report that

Kaady was possibly armed and witness accounts of gunshots in the area of the crash but also

knew that the reports could be due to sounds coming from the car fire.

A possible hit-and-run accident and assault are not minor offenses.  *See Sandy*, 551 F.

Supp. 2d at 1169 (assault and battery are "at least medium level crimes").  Thus, before Bergin

and Willard encountered Kaady sitting naked in the street, they had information to suggest that

Kaady posed a risk to themselves or the public.  The significance of that potential threat,

however, was lessened by the fact that Kaady was badly injured, outnumbered by law

enforcement officers, and sitting, naked, in the open, in plain sight.  *See Smith*, 394 F.3d at 703

(fact that plaintiff was suspected of domestic violence provided little basis for officers' use of

Page 30 - AMENDED OPINION AND ORDER

force where officers encountered him on his front porch alone, unarmed and clad in pajamas); *Chew*, 27 F.3d at 1443(significance of plaintiffs' alleged crimes lessened by the fact that he "was completely surrounded by the police, and that the prospects for his imminent capture were far greater than are those of the many fleeing suspects who are fleeter than the police officers chasing them").

### 3.    Immediate Threat to Safety

Under the second *Graham* factor, the court considers whether Kaady posed an immediate threat to the safety of officers or others.  This is "the most important single element" of the *Graham* excessive force analysis.  *Id.* at 1441.  "[A] simple statement by the officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *See Deorle*, 272 F.3d at 1281.  Thus, the possibility that an individual has a gun is cause for concern, where objective factors suggest that the potential weapon poses a threat. *Compare Miller v. Clark County*, 340 F.3d 959, 964-65 (9th Cir. 2003) (officers had reason to fear suspect was armed when he possessed a large knife moments earlier, ignored officers' commands to halt, and was hiding in dense woods where he could ambush officers); *Saman v. Robbins*, 173 F.3d 1150, 1156 (9th Cir. 1999) (officer encountered suspect at scene of a police shooting, did not know if the suspect was armed, and suspect began to comply with commands to get down on the ground but then suddenly jumped to his feet) *with Beaver v. City of Federal Way*, 507 F. Supp. 2d 1137, 1146 n.8 (W.D. Wash. 2007) (finding no immediate threat based on possibility that suspect had a weapon hidden in his waistband where officers never saw the suspect reach toward his waistband).

Page 31 - AMENDED OPINION AND ORDER

Here, before the officers encountered Kaady, they had reports that he possibly had a firearm. The dispatch report of Kaady's location on 362nd Avenue, however, did not say that he was armed and both officers knew the previous reports could be due to sounds from the fire. Moreover, when the officers arrived at the scene they could see that Kaady was naked, badly injured and sitting in the street. The officers both acknowledged that they could see Kaady did not have a weapon in his hands and it was only a possibility that he was sitting on one. In addition, no one disputes that Kaady immediately complied with the officers' orders to put his hands in the air and kept his hands in the air when the officers approached him.

Based on the foregoing facts, I conclude that Kaady posed no immediate threat when Bergin initially deployed his Taser. Bergin argues that Kaady's previous behavior and the possibility he was armed justified his decision to use his Taser. I do not accept the proposition that officers can use a Taser to shield themselves from any possibility of harm and "the suspect must suffer the consequences." *See id.* "To accept this proposition would effectively eviscerate the protections of the Fourth Amendment and also ignore the teachings of *Graham*, which counsels that a key question in this inquiry is whether a suspect poses an 'immediate' threat, not a 'possible' threat." *Id.*

Moreover, the officers' initial encounter with Kaady did not constitute a rapidly evolving situation that required them to make a split-second decision. Kaady was sitting in the open with his hands in the air. Because the situation did not demand immediate action by the officers, the court may consider the availability of alternative methods as part of its reasonableness calculus. *See Deorle*, 272 F.3d at 1282; *see also Winterrowd v. Nelson*, 480 F.3d 1181, 1186 (9th Cir.

2007) ("When no immediate threat is posed and the police can use other means of patting down a suspect, they may not insist on doing so in a manner that will cause the suspect pain.").

Here, Willard testified that he did not consider another option for safely handcuffing Kaady other than asking him to lie down on his stomach in the street or in the grass when it was apparent that Kaady had severe burns on his torso. Willard, for example, did not ask Kaady to stand up slowly and place his hands behind his back, which would have allowed them to conclude for certain that he did not have a gun before they approached to handcuff him. Additionally, the officers could simply have waited for the arrival of additional officers, who were already enroute to the scene.

Bergin's second use of the Taser presents a closer question. Both officers testified that Kaady began to get up during the first charge, either by sitting up, getting up on his side, or attempting to stand. Bergin, however, also told investigators and testified that Kaady was still on his back when he deployed the Taser for another five-second charge. Even if Kaady appeared to be getting up from the ground during the first charge, neither officer indicates that Kaady made a move toward them at that point, although Willard told investigators that Kaady growled at a low-level following the first charge. Both officers knew that Kaady had severe burns that would make the pavement painful to him. Moreover, the officers could see that Kaady was not hiding a gun under his legs. Reading the facts in the light most favorable to the plaintiffs, I conclude that Kaady posed no immediate threat when Bergin deployed the Taser a second time.

Kaady did present a threat during Willard's third and final Taser charge. Both officers testified that Willard used his Taser when Kaady got to his feet and began to stand up during the second Taser charge and that Kaady giggled and growled at the officers in response to the

Page 33 - AMENDED OPINION AND ORDER

second charge.  At that point, the officers faced an unpredictable, dynamic situation.  Kaady was

on his feet, clearly agitated and unresponsive.  Both officers might reasonably conclude that his

ability to withstand the effects of the Taser and get to his feet presented a risk, especially in light

of the report that Kaady previously assaulted an individual who was trying to assist him and had

left the scene of a potential hit-and-run accident.

### 4. Actively Resisting Arrest

Under the third and final *Graham* factor, the court must consider whether the suspect

actively resisted arrest.  Noncompliance does not constitute active resistance.  *See Winterrowd v.*

*Nelson*, 480 F.3d 1181, (9th Cir. 2007) ("verbal refusal to comply on grounds of physical

impossibility" did not justify officer's decision "to force a harmless motorist against the hood of a

car and cause him unnecessary pain");  *Santos v. Gates*, 287 F.3d 846, 855 (9th Cir. 2002)

(suspect did not actively resist arrest when he turned around as ordered but dropped his hands to

his sides instead of placing them on his head);  *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir.

2003) (finding excessive force when officer threw suspect to the ground and twisted her arms to

handcuff her, after suspect "objected vociferously" to a search of her residence and merely

"passively resisted" handcuffing); *see also Gander v. Wood,* 457 F. Supp. 2d 1152, 1156 (D. Or.

2006) (finding excessive force where officers used a canine to bite and seriously injure an

unarmed, mentally disturbed man when he failed to respond to their verbal commands to lie

down and stay down).

Here, Kaady remained seated with his hands in the air prior to Bergin's initial decision to

deploy the Taser and was attempting to get up off the ground during Bergin's second use of the

Taser.  Both officers testified that they did not approach Kaady to handcuff him after the first

Page 34 - AMENDED OPINION AND ORDER

Taser blow but instead ordered Kaady to stop or to lie down on his stomach despite his visible

severe burns.  Even assuming that Kaady verbally refused to lie down, a fact plaintiffs' eye

witness declarations call into question, I do not find that Kaady's behavior constituted active

resistance to arrest.  Kaady was on his feet attempting to stand when Willard delivered the third

Taser shock, but did not run away until immediately thereafter.

In summary, although Kaady posed a potential threat to the officers when Bergin

deployed his Taser the first time, that threat was significantly reduced by Kaady's physical state,

compliant conduct, and the fact that he was outnumbered.  Moreover, when Bergin deployed the

second Taser shock, he could discern at that point that Kaady did not have a weapon under his

legs and was merely attempting to get up from the ground.  I therefore conclude that Bergin's

first and second use of the Taser was excessive force.

Willard's use of the Taser was not constitutionally excessive.  The testimony indicates

that Kaady was on his feet, behaving unpredictably and had allegedly previously assaulted a

bystander.  Reading the facts in the light most favorable to the plaintiff, Kaady made no

movement toward either officer and Willard could see Kaady was unarmed and possibly

suffering from some form of mental incapacity.  On the other hand, by getting to his feet despite

the officers' orders to stop, Kaady posed a risk of flight.  I therefore conclude that Willard's use

of the Taser did not constitute excessive force.  Moreover, even if I were to find that Willard's

Taser use amounted to excessive force, Willard would be entitled to qualified immunity, as

explained below.

**B.    Taser Use – Clearly Established Right**

Page 35 - AMENDED OPINION AND ORDER

Under the second part of the qualified immunity analysis, I must now inquire whether the law put the officers on notice that their conduct was unlawful. *See Saucier*, 533 U.S. at 202. That inquiry leads me to conclude that the law clearly established that officers cannot use intermediate force against an individual suspect who does not pose an immediate threat, even if the suspect is not fully complying with police commands. In *Watkins v. City of Oakland*, the Ninth Circuit held it was clearly established that an officers' decision to deploy a police dog after a suspect has surrendered constituted excessive force. 145 F.3d 1087, 1093 (9th Cir. 1998) (citing *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994)). In that case, the officers refused to call off the police dog until the plaintiff complied with commands to show his hands. *Id.* at 1090. Moreover, in *Headwaters Forest Defense v. Humboldt County*, the Ninth Circuit held that officers violated clearly established law when they used pepper spray to move protestors who were sitting peacefully and did not threaten to harm the officers but had locked themselves together and refused to move voluntarily. 276 F.3d 1125, 1130 (9th Cir. 2002) ("Because the officers had control over the protestors, it would have been clear to any reasonable officer that it was unnecessary to use pepper spray to bring them under control."); *see also Deorle*, 272 F.3d 1285 (denying qualified immunity where officer shot rubber bullets at an unarmed, emotionally disturbed man who posed no risk of flight and presented no objectively reasonable threat).

Defendants argue that pain compliance techniques do not constitute excessive force. The cases supporting that contention, however, involve volatile crowd situations or aggressive suspects, not an encounter with a single individual sitting in the street. *See Gregory v. County of Maui*, 523 F.3d 1102, 1106-07 (9th Cir. 2008) (suspect brandished a pen at officers, refused to put it down and resisted officer's efforts to grab his arm and move it so the pen was facing away);

Page 36 - AMENDED OPINION AND ORDER

*Tatum v. City and County of San Franciso*, 441 F.3d 1090, 1096 (9th Cir. 2006) (officer used bar

arm control hold to place handcuffs on an agitated suspect and to force the suspect to the ground

when he resisted the officer's efforts to handcuff him); *Forrester v. City of San Diego*, 25 F.3d

804, 807 (9th Cir. 1994) (officers used gradually increased pressure on protestors' arms and

wrists to force them to stand up and walk when more than 100 protestors engaged in concerted

effort to invade private property and obstruct access to a medical facility); *Eberle v. City of

Anaheim*, 901 F.2d 814, 820 (9th Cir. 1990) (officer applied a finger-hold to control suspect

while his friends scuffled with other officers and a crowd of sixty-to-seventy had gathered to

watch).  I find these cases unpersuasive to support defendants' contention that their actions here

were reasonable.

       Alternately, defendants cite several cases where courts have found that Taser use did not

constitute excessive force.  In each of those cases, however, the suspect engaged in actual

physical struggle or threatening behavior before the officer deployed the Taser.  *Draper v.

Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (use of Taser reasonable force to respond to

"hostile, belligerent, uncooperative" conduct during traffic stop); *Goldsmith v. Snohomish

County*, 558 F. Supp. 2d 1140, 1147, 1150-51 (W.D. Wash. 2008) (Taser reasonable to subdue

emotionally disturbed man struggling with officers in a confined space); *Lavette v. City of

Fresno*, 551 F. Supp. 2d 1149, 1171 (E.D. Cal. 2008) (domestic violence suspect  refused officer

commands and pulled alleged victim with him into the house); *Shulgan*, No. 07-051, 2008 WL

1730091 at *10-11 (E.D. Wash. April 10, 2008) (suspect advanced toward officer with hands in

his pockets despite commands to stop); *Zackery v. Stockton Police Dep't*, No. 05-2315, 2008 WL

53224 at *11-12 (E.D. Cal. Jan. 2, 2008) (suspect on the ground, on his stomach, "struggling

with officer" and refused to place his hands behind his back); *Beaver*, 507 F. Supp. 2d at 1145-

47  (initial uses of Taser reasonable because suspect attempted to flee, but later uses not

reasonable because suspect was on the ground and backup had arrived to assist with his

detention); *McDonald v. Pon*, No. 05-1832J, 2007 WL 4420936, at *3-4 (W.D. Wash. Dec. 14,

2007) (shoplifting suspect verbally combative, ignored officer commands and had just tackled

two security guards and punched one in the face); *Goebel v. Taser Intern., Inc*., No.07-0027,

2007 WL 2713053 at *1-2, 6-7 (N.D. Ohio, Sept. 14, 2007) (suspect threatened to kill officers

and threw a glass vase and other items at them); *Schumacher v. Halverson*, 467 F. Supp. 2d 939,

944, 951 (D. Minn. 2006) (suspect resisted arrest by pulling away from the officer twice and

then locking his arms around a post*); Magee v. City of Daphne*, No. 05-0633, 2006 WL

3791971, at *9-10 (S.D. Ala., Dec. 20, 2006) (domestic violence suspect "agitated, aggressive"

and "drunk and hostile").  These cases do not persuade me that Bergin's conduct was reasonable,

but they suggest that Willard had reason to believe he could deploy his Taser when he saw that

Kaady was on his feet, agitated and unresponsive to commands.

     After reviewing the case law, I conclude that, as of September 2005 when Bergin used

his Taser on Kaady, police officers had reasonable notice that they may not use a Taser against

an individual suspect who does not pose a threat and has merely failed to comply with

commands.  I therefore deny Bergin's motion for summary judgment on plaintiffs' First Claim for

Relief, which alleges that the Taser constituted excessive force.  On the other hand, because

Willard used his Taser after Kaady posed a threat, I find that Willard is entitled to qualified

immunity.  I accordingly and grant Willard's motion for summary judgment on plaintiff's First

Claim for Relief.

C.        **Deadly Force Standard**

In *Tennessee v. Garner*, the Supreme Court held that an officer's use of deadly force is reasonable if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.  471 U.S. 1, 11 (1985).  The Supreme Court has since explained that "*Garner* did not establish a magical on/off switch that triggers rigid preconditions when an officer's actions constitute 'deadly force.'" *Scott v. Harris*, 550 U.S. 372, ___, 127 S. Ct. 1769, 1778, 167 L. Ed. 2d 686 (2007).  Rather, *Garner* is an application of the Fourth Amendment's reasonableness test.  *Id.*  The Ninth Circuit recognized that *Scott* requires courts to apply a reasonableness standard and explained that "[o]ur case law requires that a reasonable officer under the circumstances believe herself or others to face a threat of serious physical harm before using deadly force."  *Price v. Sery*, 513 F.3d 962, 971 (9th Cir. 2008).  The officer must have a reasonable belief deadly force is necessary, based on the nature of the threat – not the officer's subjective fears.  *Id.* at 969-70.

Because the officer defendants are often the only surviving eyewitnesses in deadly force cases, the court must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officers' story is internally consistent and consistent with other known facts.  *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994); *Ting v. United States*, 927 F.2d 1504, 1510-11 (9th Cir. 1991).  In other words, the court should "look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably."  *Scott*, 39 F.3d at 915.

Here, the record includes the statements and testimony of Willard and Bergin, several eye witness declarations and forensic evidence, and presents two different accounts of Kaady's actions immediately preceding the officers' decision to shoot.  In Bergin and Willard's account, Kaady threatened to kill Willard and appeared poised to leap on top of him from the top of the patrol car, which posed a threat in the event Kaady grabbed Willard's gun.  Witness accounts indicate that they did not hear Kaady threaten to kill Willard.  In addition, witnesses reported that Kaady did not appear to be lunging at the officers and one witness stated that Kaady appeared to be attempting to flee.   The forensic expert  declaration does not resolve the contradictions in these accounts.  It indicated that, although one gunshot wound was consistent with Kaady facing the shooter and bent at the waist, other shots hit Kaady as he was turned away from the officers and the wounds suggested he had his hands in the air.  The conflicting evidence leads me to conclude that material questions exist regarding the circumstances of the shooting. *See Ting*, 927 F.2d at 1510.

### D.    Deadly Force – Clearly Established Right

At the time of the shooting, case law clearly established that "[l]aw enforcement officers may not shoot to kill unless, at a minimum, the suspect presents an immediate threat to the officer or others, or is fleeing and his escape will result in a serious threat of injury to persons." *Harris v. Roderick*, 126 F.3d 1189, 1203 (9th Cir. 1997) (officer employed excessive deadly force when he shot and killed an armed suspect who walked toward his cabin without threatening the officers, even though the suspect had engaged in a shoot-out with officers on the previous day); *Adams v. Speer*, 473 F.3d 989, 993-94 (9th Cir. 2007) (finding, that as of 2001, reasonable officer would know it was a constitutional violation to shoot and kill a suspect who

Page 40 - AMENDED OPINION AND ORDER

had engaged in car chase with the officer but was unarmed and did not pose a threat to the

officer); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (police officers could

not reasonably believe deadly force lawful where, under plaintiffs' version of the facts, domestic

violence suspect did not point his gun at the officers and faced away from the officers when they

shot him the first time).  Moreover, under Ninth Circuit case law, "if an officer intentionally or

recklessly provokes a violent confrontation, if the provocation is an independent Fourth

Amendment violation, he may be held liable for his otherwise defensive use of deadly force."

*Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002).  Under this rule, "the question becomes

the scope of the liability, or what harms the constitutional violation proximately caused."  *Id.* at

1190.

Here, if the plaintiffs' version of the shooting is credited, Willard and Bergin shot at

Kaady when he posed no threat to them or to bystanders.  Under plaintiffs' version, Kaady did

not threaten to kill Willard or lunge at him but instead was attempting to escape from the

officers.  In addition, although Willard and Bergin contend that Kaady posed a risk to others

because he could acquire the rifle Willard left on the hood of the car, or could take the car itself,

they shot Kaady while he was on the roof of the car, facing away from both the rifle and the

driver's seat.  Moreover, without a car or weapon, Kaady, who was naked and severely injured,

posed little threat to the witnesses in the area, who either had vehicles or were near their homes

and more than 80 yards away from him.  I therefore conclude that plaintiffs' version of the facts

shows a rights violation that would be clear to a reasonable officer.  As a result, in light of the

factual conflict surrounding the shooting, I deny Willard and Bergin's motion for summary

judgment on the plaintiffs' deadly force claim, the plaintiffs' Second Claim for Relief.

Page 41 - AMENDED OPINION AND ORDER

In summary, I grant Willard's motion for summary judgment on the First Claim for

Relief, which alleges that the Taser constituted excessive force, and deny Bergin's motion for

summary judgment on that claim.  I deny both Willard's and Bergin's motions for summary

judgment on the Second Claim for Relief, which alleges unlawful deadly force.  Although both

parties briefed unlawful arrest, at oral argument plaintiffs conceded that the officers had probable

cause to arrest Kaady.  Therefore, to the extent that the complaint alleged a cause of action for

unlawful arrest without probable cause, plaintiffs have abandoned that claim.

**IV.    Municipal Liability Under 42 U.S.C. § 1983**

Municipal liability under § 1983 requires proof of a policy or custom that caused the

deprivation of the plaintiff's constitutional rights.  *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658

(1978).  There are three ways to prove existence of a municipal policy or custom: 1) by showing

the constitutional violation "was the result of a longstanding practice or custom which constitutes

standard operating procedure"; 2) by proving that the decision-making official was, as a matter

of state law, a final policymaking authority whose acts may constitute official policy; 3) by

showing an official with final policymaking authority either "delegated that authority to, or

ratified the decision of a subordinate."  *Price*, 513 F.3d at 966 (internal cit.  Thus, a

policymaker's single decision causally related to the constitutional deprivation may be sufficient

to prove liability under certain circumstances.  *See Pembaur v. City of Cincinnati*, 475 U.S. 469,

484 (1986) (county prosecutor's policy decision that deputies should forcibly enter a clinic

provided basis for municipal liability because it led to a violation of the plaintiff's Fourth

Amendment rights).

Page 42 - AMENDED OPINION AND ORDER

A plaintiff who seeks to prove municipal liability based on a policymaker's ratification must demonstrate the policymaker approved the subordinate's decision and the basis for it. *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion). The Ninth Circuit has found municipal liability on the basis of ratification "when the officials involved adopted and expressly approved the acts of others who caused the constitutional violation." *Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996) (citing cases). Mere acquiescence in a subordinate's discretionary decision, however, is insufficient. *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992) (holding plaintiff did not establish ratification where the policymaker did not overrule subordinate fire chief's discretionary decision to discipline a fire fighter).

A plaintiff cannot establish municipal liability unless the plaintiff can demonstrate that the municipal policy caused the ultimate injury. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*," unless the proof demonstrates that "an existing, unconstitutional municipal policy" caused the incident. *Id.* Where, however, the policy is not itself unconstitutional, "considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Id.*

Here, plaintiffs pursue municipal liability under a theory of ratification and confirmed at oral argument that they have abandoned their Third, Fifth, Sixth and Eighth Claims for Relief, which allege other theories. Neither party disputes that the sheriff is the final policymaker for the Clackamas County Sheriffs Office and the chief of police is the final policymaker for the City of Sandy Police Department. Plaintiffs contend that these policymakers effectively ratified

Page 43 - AMENDED OPINION AND ORDER

their subordinate officers' use of force when they adopted the findings of the Shooting Review

Board and concluded that their officers acted in accordance with policy.

A plaintiff may prove municipal liability by presenting evidence that the policymaker

knew of the subordinate's conduct and approved of that conduct, resulting in a continued

violation of the plaintiff's constitutional rights. *See Lytle v. Carl*, 382 F.3d 978, 988 (9th Cir.

2004) (holding policymaker did more than fail to overrule a subordinate when facts

demonstrated the policymaker knew of and actively participated in the unconstitutional conduct);

*Christie v. Iopa*, 176 F.3d 1231, 1240 (9th Cir. 1999) (same); *Hyland v. Wonder*, 117 F.3d 405,

416 (9th Cir. 1997) (policymakers voted to continue unconstitutional ban on plaintiff's access to

juvenile hall); *Hammond v. County of Madera*, 859 F.2d 797, 802-803 (9th Cir. 1988) (board,

which was responsible for transfers of rights-of-way, approved and recorded invalid right-of-way

deeds that resulted in a deprivation of the plaintiff's constitutional rights).

A plaintiff may also establish municipal liability where police misconduct is so pervasive

that the policymakers' failure to discipline, reprimand or take other remedial action serves as

proof of a preexisting policy of deliberate indifference to such abuse. *See Fuller v. City of*

*Oakland*, 47 F.3d 1522, 1535 (9th Cir. 1995) (police chief demonstrated reckless disregard for

plaintiffs' rights when he approved of internal affairs' finding that plaintiff's sexual harassment

claim was unsupported despite his awareness of "glaring deficiencies" in the investigation);

*Larez v. City of Los Angeles,* 946 F.2d 630, 647 (9th Cir. 1991) (police chief demonstrated

approval of unconstitutional conduct by failing to correct flawed investigation procedures or to

address widespread problem with use of excessive force and by his own statement that the

plaintiff was lucky he was not more seriously injured by his officers); *see also Grandstaff v. City*

*of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (chief took no action after all six officers in the night shift engaged in a "wild barrage" constituting a "gross abuse of the use of deadly weapons," resulting in the death of an innocent bystander).

The cases above demonstrate that "some municipal pronouncements ratifying a subordinate's action could be tantamount to the announcement or confirmation of a policy for purposes of municipal liability. *Haugen v. Brosseau*, 351 F.3d 372, 393 (9th Cir. 2003) reversed on other grounds, 543 U.S. 194 (2004).   A single failure to discipline an officer, however, does not necessarily rise to the level of ratification.  *Id.*; *see also Siwiec v. Thompson*,  No. CV-02-454-ST, 2004 U.S. Dist. LEXIS 22882, at * 77-78 (D. Or. Nov. 3, 2004) (sheriff's concurrence in the findings of the internal affairs investigation of a single encounter was insufficient to proceed against the county on a ratification theory) *but see Ashley v. Sutton*, 492 F. Supp. 2d 1230, 1253 (D. Or. 2007) (police chief 's declaration that subordinate officer properly followed department  procedures sufficient to establish municipal liability if jury found officer employed excessive force).

Here, no evidence suggests that the Sandy Chief of Police or the Clackamas County Sheriff actively participated in the alleged constitutional violations, nor does any evidence indicate that the conduct was pervasive.  The incident involved one officer and one deputy and the plaintiffs have not presented evidence of similar incidents.  Moreover, no evidence suggests that the chief or sheriff upheld the findings of a glaringly deficient investigation.  While plaintiffs presented evidence that investigators asked leading questions and misstated witness reports, nothing indicates that they did so at the behest of the sheriff and chief of police, or that the sheriff and chief were aware of problems with the investigation.

Page 45 - AMENDED OPINION AND ORDER

Plaintiffs have failed to produce sufficient evidence to support ratification.  While the court in *Ashley* held that a plaintiff could establish municipal liability based on the chief's declaration that his officer acted in accordance with policy, I find that case unpersuasive.  My view of the law and the facts of this case leads me to conclude that plaintiff cannot support municipal liability.  I accordingly grant Clackamas County's and the City of Sandy's motions for summary judgment on plaintiffs' 42 U.S.C. § 1983 claims.

## V.    State Wrongful Death Claims

### A.    Proper Defendants

Under the Oregon Tort Claims Act, a plaintiff who sues over a municipal officer's tortious conduct must name the municipality, not the individual officer, as the defendant.  Or. Rev. Stat. § 30.265(1) (2007); *Haase v. Eugene*, 85 Or. App. 107, 110, 735 P.2d 1258 (1987).  The Act also places a cap on the damages plaintiffs can recover from the public entity.  Or. Rev. Stat. § 30.270.   The Remedy Clause of the Oregon Constitution, however, guarantees that "every man shall have remedy by due course of law for injury done him in his person, property, or reputation.  Or. Const. art. I, § 10.   Thus, in certain situations, the Oregon Tort Claims Act limitations may violate the Remedy Clause.  *See Clarke v. Oregon Health Sciences University*, 343 Or. 581, 610, 175 P.3d 418 (2007) (holding that Oregon Tort Claims Act's elimination of a cause of action against public employees violates the Remedy Clause where the substituted remedy against the public body, "is an emasculated version of the remedy that was available at common law").

Here, plaintiffs rely on the holding in *Clarke* to assert that Willard and Bergin are proper defendants to the state wrongful death causes of action.  A plaintiff seeking to establish a

Page 46 - AMENDED OPINION AND ORDER

violation of Oregon's Remedy Clause, however, must demonstrate that, when the drafters wrote the Oregon Constitution in 1857, the common law of Oregon recognized a cause of action for the alleged injury. *Hughes v. PeaceHealth*, 344 Or. 142, 147, 178 P.3d 225 (2008). In *Hughes*, the Oregon Supreme Court held that Oregon did not have a common law action for wrongful death in 1857. *Id.* at 152. I therefore reject plaintiffs' Remedy Clause argument. Under Oregon Revised Statute § 30.265(1), Willard and Bergin are not proper defendants to plaintiffs' state law wrongful death claims. I accordingly grant Willard's and Bergin's motions for summary judgment on those claims.

## B.    Negligence Allegations

In Oregon, evidence that the defendants engaged solely in intentional conduct may not support a claim for negligence. *See, e.g., Kasnick v. Cooke*, 116 Or. App. 580, 583, 842 P.2d 440 (1992). When a defendant's conduct is willful and intentional, it is no longer negligence. *See generally Denton v. Arnstein*, 197 Or. 28, 45, 250 P.2d 407 (1952); *see also* Restatement (Second) of Torts § 282, cmt. d. However, when the plaintiff could recover under either negligence or intentional conduct, the evidence supports both theories "and both are properly pleaded, the plaintiff is entitled to have both theories submitted to the jury." *See Smith v. Williams*, 180 Ore. 626, 631, 178 P.2d 710 (1947) (internal citation omitted); *see also Cook v. Kinzua Pine Mills Co.*, 207 Or. 34, 60, 293 P.2d 717 (1956) (when the proper theory for recovery depends on proof of the defendant's state of mind, the plaintiff may plead both negligence and intentional injury).

Here, plaintiffs' wrongful death causes of action allege that "the act of shooting Fouad was committed with the intent to cause serious bodily injury" and further allege that "the acts

Page 47 - AMENDED OPINION AND ORDER

and omissions" of the defendants amounted to negligence. Defendants contend that plaintiffs

have only presented facts related to an intentional conduct (the officers' decision to shoot Kaady)

and therefore may not proceed on a negligence theory. Plaintiffs did not respond to this in the

briefing but asserted at oral argument that they are entitled to plead in the alternative.

I find defendants' argument unpersuasive. While the parties appear to agree that the act

of shooting itself was intentional, the events that led up to the use of deadly force may support a

claim for negligence. I therefore conclude that it is premature to require that the plaintiffs elect

between negligence and intentional conduct in their state wrongful death claims.

### C.    Deadly Force Standard Under Oregon Law

Oregon law analyzes an officer's decision to use deadly in force in terms similar to the

Fourth Amendment analysis. The law authorizes a police officer to use deadly force when "the

use of deadly physical force is necessary to defend the peace officer or another person from the

use or threatened imminent use of deadly physical force" or "the officer's life or personal safety

is endangered in the particular circumstances involved." Or. Rev. Stat. § 161.239(1). In addition,

Oregon courts recognize a presumption that a police officer acts in good faith in determining the

amount of force to be used in making an arrest. *Rich v. Cooper*, 234 Or. 300, 311, 380 P.2d 613

(1963).

Defendants City of Sandy and Clackamas County contend that, under Oregon law, they

are not liable for wrongful death because the officers acted reasonably and in good faith. As

explained in the Fourth Amendment analysis above, material questions of fact exist regarding

this issue. I therefore deny the City of Sandy's and Clackamas County's motions for summary

judgment on the wrongful death claims.

Page 48 - AMENDED OPINION AND ORDER

**CONCLUSION**

The court denies the motions to strike asserted in Plaintiffs' Response to Joint Concise Statement of Fact (#98), defendants' Joint Motion to Strike Factual Claims in Plaintiffs Memorandum and Concise Statement (#110), defendants' Joint Motion to Strike Michael Lyman Declaration (#108) and defendants' Joint Motion to Strike Fact Witness Declarations (#113). The court recognizes that defendants entered the Motion To Strike Lay Declarations (#106) in error because it duplicates material already submitted for (#110) and (#113) therefore denies (#106) as moot.

Defendant Clackamas County's motion for summary judgment (#61) is granted on plaintiffs' Fourth Claim for Relief and on the Ninth Claim for Relief to the extent that claim is brought by plaintiffs Rachid, Vania and Andrea Kaady.  Clackamas County's motion (#61) is denied, however, on the Ninth Claim for relief to the extent that claim is brought by plaintiff Samira Kaady.  Plaintiffs have abandoned their Third and Fifth Claims for Relief, which they asserted against Clackamas County.

Defendant City of Sandy's motion for summary judgment (#69) is granted on plaintiffs' Seventh Claim for Relief and on the Tenth Claim for Relief to the extent that claim is brought by plaintiffs Rachid, Vania and Andrea Kaady.  The City of Sandy's motion (#69) is denied with regard to plaintiffs' Tenth Claim for Relief to the extent that claim is brought by Samira Kaady. Plaintiffs have abandoned their Sixth and Eighth Claims for Relief, which they asserted against the City of Sandy.

Defendant Bergin's motion for summary judgment (#63) is granted on plaintiffs' Tenth Claim for Relief and on the First and Second Claims for Relief  to the extent those claims are

brought by plaintiffs Rachid, Vania and Andrea Kaady.  Bergin's motion (#63) is denied with regard to plaintiffs' First and Second Claims for Relief to the extent those claims are brought by Samira Kaady.

Defendant Willard's motion for summary judgment (#68) is granted on plaintiffs' Ninth Claim for Relief and on the First Claim for Relief.  Willard's motion (#68) is granted on plaintiff's Second Claim for Relief to the extent that claim is brought by plaintiffs Rachid, Vania and Andrea Kaady.   Willard's motion (#68) is denied with regard to plaintiffs' Second Claim for Relief to the extent that claim is brought by Samira Kaady.

IT IS SO ORDERED.

Dated this 26th day of November, 2008.

  /s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge

Page 50 - AMENDED OPINION AND ORDER